SILVERMAN, Circuit Judge:
Northwest Environmental Advocates (“NWEA”) challenges the adequacy of a 2003 Final Supplemental Integrated Feasibility Report and Environmental Impact Statement prepared by the United States Army Corps of Engineers in connection with a project to deepen the Columbia River navigation channel and to propose new sites for disposal of dredged materials. NWEA argues that the Corps violated the National Environmental Policy Act (“NEPA”), 42 U.S.C. § 4321 et seq., because, it claims, the Final Supplemental Integrated Feasibility Report and Environmental Impact Statement fails to take a “hard look” at the channel deepening project’s various impacts. The district court saw otherwise, and held that the Corps had taken the requisite “hard look” at the particular environmental and economic factors at issue. Based on the Corps’ extensive examination of the project’s cumulative, direct, and economic impacts, we agree with the district court that the Corps has taken the required hard look. *1129 We have jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.[1]
I. Factual Background
A. The Channel Deepening and Dredged Material Disposal Project
The Columbia River represents a major cargo gateway to the Pacific Northwest. The current depth of the Columbia River navigation channel is 40 feet. Over the past twenty years, larger vessels with “design drafts” exceeding this 40-foot channel depth have carried an increasing share of Columbia River cargo tonnage. Because of the constraints of channel depth, these vessels must arrive “light-loaded.” According to the Corps, the current 40-foot channel constrains 70 percent of vessels involved in the transpacific container trade while a 43-foot depth would constrain only 30 percent.
In 1989, Congress directed the Corps to assess the feasibility of deepening the Columbia River’s 40-foot navigation channel to a maximum of 43 feet in order to enhance shipping capacity. The current channel deepening project involves deepening the channel from Columbia River Mile 3 to Mile 106.5. The project also includes various ecosystem restoration actions.[2] The “channel deepening project” also proposes three disposal sites to accommodate dredged material from both channel deepening and the Mouth of the Columbia River project, an independent dredging project. The first two areas are so-called Ocean Dredged Material Disposal Sites and include the Shallow Water Site,[3] a dispersive site[4] located within the littoral cell, and a Deep Water Site. The third area is the North Jetty Site, which is also dispersive and located within the littoral cell. Material dumped at the Shallow Water Site and the North Jetty Site stays in the littoral system, where it can accrete on coastlines to counteract erosion. Sediment placed at the Deep Water Site is considered “inert” because it is effectively removed from the sediment transport system.
In August 1999, the Corps released a Final Integrated Feasibility Report and Environmental Impact Statement for the *1130 Columbia River Channel Improvement Project.[5] This several-hundred-page document contains numerous analyses of the proposed project and its alternatives, affected environment, environmental impact, and implementation. It also includes plans to dispose of dredged material from the Mouth of the Columbia River project and from channel deepening in the North Jetty Site, Site E, and the Deep Water Site. The U.S. Fish and Wildlife Service issued a “No Jeopardy” Biological Opinion on the project’s potential impact on certain Endangered Species Act-listed wildlife and plant species. After initially finding that the project would not jeopardize salmonids protected under the Endangered Species Act, NOAA fisheries withdrew its favorable Biological Opinion, citing new information on the project’s potential impact on bathymetry, river flow, and resuspension of toxins.
Following this withdrawal, the States of Washington and Oregon denied certification of the project under Section 401 of the Clean Water Act, 33 U.S.C. § 1341, and the Coastal Zone Management Act, 16 U.S.C. § 1451 et seq. They expressed concern over the project’s effects on sediment transport and Dungeness crab as well as its consistency with existing coastal programs. Consultations with state agencies followed, and the Corps began preparing a supplemental environmental impact statement to address those concerns. As part of that process, in February 2001, the Corps, NOAA Fisheries, and the U.S. Fish and Wildlife Service hired the non-profit Sustainable Ecosystems Institute to review the channel deepening project’s potential environmental impacts. The SEI process involved project reviews by SEI staff members as well as by an independent panel of seven scientific experts. Throughout 2002, the Corps received and responded to numerous comments on the draft supplemental environmental impact statement, including comments from NWEA. Also in 2001, the Corps issued a Biological Assessment of fish and wildlife, which the subsequent Final Supplemental Integrated Feasibility Report and Environmental Impact Statement incorporates as Exhibit H. Based on the Corps’ new studies, NOAA Fisheries changed its assessment of the project. In May 2002, it and the U.S. Fish and Wildlife Service issued final Biological Opinions concluding that the channel deepening project would not adversely affect Endangered Species Act-protected species.
In January 2003, the Corps issued its Final Supplemental Integrated Feasibility Report and Environmental Impact Statement (“FSEIS”).[6] The document spans several hundred pages and supplements, updates, and incorporates through reference the 1999 Final Integrated Feasibility Report and Environmental Impact Statement. Among numerous additional studies, the 2003 FSEIS includes' Exhibit J, which directly responds to Oregon and Washington’s concerns by analyzing the impact of channel deepening on sediment transport in the Columbia River. Based qn the revised and expanded analyses, Washington and Oregon withdrew their objections and certified the project.
On January 9, 2004, the Corps issued its Record of Decision approving the channel deepening project.
*1131 B. The Channel Maintenance Project
Independently of the proposed channel deepening project, the Corps operates an ongoing dredging project to maintain the current depth of the Columbia River navigation channel at 40 feet. As part of that project, the Corps released a Dredged Material Management Plan and Supplemental Impact Statement in June 1998. The purpose of the Dredged Material Management Plan and Supplemental Impact Statement is to create a 20-year disposal plan for dredged sediments and evaluate proposed changes in dredging and disposal, including shifting current disposal of dredged material to other sites. As described in the 2003 FSEIS for channel deepening, the channel maintenance project represents the “No Action Alternative” to channel deepening.
C. The Columbia River Littoral Cell and Other Ongoing Projects
A central concern of this appeal is the potential for various Corps projects to exacerbate coastal erosion. Historically, the Columbia River has drawn sand from inland areas and deposited it in the estuary, which in turn provided sediment to 100 miles of shoreline from Tillamook Head, Oregon to Point Grenville, Washington. This area is known as the Columbia River littoral cell. Over the past 120 years, various natural and human activities have reduced the amount of sand deposited in and throughout the littoral cell, contributing to erosion of the Oregon and Washington coasts.
In addition to the projects described above, the Corps and other agencies currently operate several other projects in and around the Columbia River. Most relevant to this appeal is the Mouth of the Columbia River (“MCR”) project, which the Corps has operated since 1983. The MCR area is a 0.5-mile-wide navigation channel that runs for six miles through the entrance between the Pacific Ocean and the Columbia River. As part of the MCR project, the Corps maintains a channel depth of 55 feet by removing approximately 4.5 million cubic yards of sediment every year. The Corps has placed material dredged from the MCR in four ocean disposal sites (referred to as Sites A, B, E, and F), which the EPA designated in 1977. To accommodate more material, Sites A, B, and F were expanded in 1993, and Site E was expanded in 1997. Recent analyses reveal that the disposal sites for material dredged from the MCR project have or will soon reach capacity. As mentioned, the channel deepening project includes a proposal for three new sites — the North Jetty Site, Shallow Water Site, and Deep Water Site — to accommodate material dredged from the MCR project, as well as from the navigation channel itself.
In addition to the MCR project, the Corps has constructed several jetties at the entrance of the MCR. Furthermore, the Corps and the Bureau of Reclamation operate a system of dams along the Columbia River known collectively as the Federal Columbia River Power System.
II. Procedural History
NWEA filed suit in district court alleging that NOAA Fisheries had violated the Endangered Species Act by failing to study adequately the impact of the Corps’ dredging activities on protected salmon. Shortly thereafter, NWEA filed a first amended complaint arguing that the Corps’ 2003 FSEIS and 1998 Dredged Material Management Plan and Supplemental Impact Statement did not sufficiently analyze the impacts of the deepening and maintenance projects as required by NEPA. NWEA subsequently amended its complaint two more times, arguing that the Corps was required to prepare a supplemental environmental impact statement *1132 under NEPA and challenging NOAA Fisheries’ revised Biological Opinion. Because of their significant interest in the navigation channel and their role as local sponsors of the channel deepening project, the Ports of Vancouver, Woodland, Kalama, Longview, Portland, and St. Helens sought and were granted intervenor status.
Presented with cross-motions for summary, judgment, the district court granted summary judgment to NOAA Fisheries, the Corps, and the Sponsor Ports, and denied summary judgment to NWEA.
Regarding the alleged NEPA violations, the district court ruled that the Corps took the requisite “hard look” at the direct and indirect effects of the channel deepening project on sediment budget, river toxicity, and salinity. See Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 993 (9th Cir.2004). The court also ruled that the channel deepening and Mouth of the Columbia River projects are not “connected actions” under 40 C.F.R. § 1508.25(a)(1) and that the environmental impact statement for the former need only consider the latter in the context of “cumulative impact.” The court struck and declined to consider the extra-record declaration of economist Ernest Niemi submitted by NWEA relating to the Corps’ economic analysis. The stated purpose of Niemi’s declaration was to “determine whether or not the FSEIS provides a misleading description of the Project’s potential impacts.” The court ruled that use of this declaration would be improper under Asurco, Inc. v. EPA, which held that a court may not consider extra-record evidence “to determine the correctness or wisdom of the agency’s decision.” 616 F.2d 1153, 1160 (9th Cir.1980). Noting the approval of independent expert reviewers, the court upheld as proper the Corps’ economic analysis.
Regarding the alleged Endangered Species Act violations, the court ruled that NOAA Fisheries could justify its No Jeopardy determination concerning salmonids because the project would improve the estuary’s environmental baseline and have minimal impact on Endangered Species Act-listed species. The court further held that NOAA Fisheries’ baseline analysis was not arbitrary and capricious because the agency “fully evaluated the environmental baseline and the effects of the action when added to that baseline.” The rulings on the Endangered Species Act claims are not challenged on appeal.
III. Standard of Review
We review de novo a district court’s grant or denial of summary judgment. Ground Zero Ctr. for Non-Violent Action v. U.S. Dep’t of Navy, 383 F.3d 1082, 1086 (9th Cir.2004). De novo review of the district court judgment means that we must “ ‘view the case from the same position as the district court.’ ” Ka Makani O Kohala Ohana Inc. v. Water Supply, 295 F.3d 955, 959 (9th Cir.2002) (quoting Sierra Club v. Babbitt, 65 F.3d 1502, 1507 (9th Cir.1995)). Pursuant to the Administrative Procedure Act, a court may set aside the decision of an administrative agency such as the Corps only if it is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.” 5 U.S.C. § 706(2)(A); see Nat’l Wildlife Fed’n v. Army Corps of Eng’rs, 384 F.3d 1163, 1170 (9th Cir.2004). We previously have held: *1133 Lands Council v. Powell, 395 F.3d 1019, 1026 (9th Cir.2005) (internal citations omitted). We review an environmental impact statement “to determine whether it contains ‘a reasonably thorough discussion of the significant aspects of the probable environmental consequences’ ” of a particular project. City of Carmel-By-The-Sea v. U.S. Dep’t of Transp., 123 F.3d 1142, 1150 (9th Cir.1997) (quoting Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th Cir.1992)). Alternatively phrased, we review agency decisions to ensure that “the agency has taken a ‘hard look’ at the potential environmental consequences of the proposed action.” Klamath-Siskiyou, 387 F.3d at 993(quoting Churchill County v. Norton, 276 F.3d 1060, 1072 (9th Cir.2001)). In so doing, while we carefully scrutinize an agency’s actions under NEPA, we must “be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency.” Klamath-Siskiyou, 387 F.3d at 993; see Anderson v. Evans, 371 F.3d 475, 489 (9th Cir.2004).
*1132 An agency’s action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency’s decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise, or if the agency’s decision is contrary to the governing law.
*1133 We review a district court’s decision to exclude extra-record evidence for abuse of discretion. Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1447(9th Cir.1996).
IV. Analysis
A. Waiver
As a preliminary matter, we reject the Corps’ and the Sponsor Ports’ arguments that NWEA somehow waived its challenge to the Dredged Material Management Plan and Supplemental Impact Statement or that it is moot. The district court addressed the Dredged Material Management Plan and Supplemental Impact Statement in its summary judgment order and NWEA refers to this document throughout its brief. Furthermore, the channel deepening project does not necessarily supersede the channel maintenance project or render challenge to it moot; if the Corps does not pursue channel deepening, it is presently slated to pursue channel maintenance as the “No Action Alternative.”
Likewise, the record clearly indicates that NWEA raised the issue of deep water disposal in the context of cumulative impact both in the administrative proceedings and the district court. Therefore, NWEA has not waived these objections and we review them on the merits.
B. Cumulative Impact on Coastal Erosion
We reject NWEA’s principal claim that the Corps violated NEPA by failing to take a hard look at the cumulative impact on coastal erosion of removing significant amounts of sand from the littoral region. The Corps conducted numerous analyses spanning two environmental impact statements to address the problem of coastal erosion. The Corps responded to concerns from interested parties with additional studies and with those concerns in mind structured its disposal plan to minimize coastal erosion. The Corps took the requisite hard look at this issue.
As we have repeatedly held, NEPA imposes procedural requirements on agencies and does not mandate substantive outcomes. Natural Res. Def. Council v. U.S. Forest Serv., 421 F.3d 797, 811 (9th Cir.2005); see Klamath-Siskiyou, 387 F.3d at 993; Dep’t of Transp. v. Pub. Citizen, 541 U.S. 752, 756-57, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004); Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). For “major Federal actions significantly affecting the quality of the human environment,” 42 U.S.C. § 4332(C), NEPA requires an agency to prepare an environmental impact statement. Klamath-Siskiyou, 387 F.3d at *1134 993. An environmental impact statement “shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment.” 40 C.F.R. § 1502.1.
Pursuant to 40 C.F.R. § 1508.25(c)(3), an environmental impact statement must consider a proposed project’s “cumulative impact,” which 40 C.F.R. § 1508.7 defines as:
the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.
We have held that an environmental impact statement must “catalogue adequately past projects in the area” and provide a “useful analysis of the cumulative impact of past, present, and future projects.” City of Carmel-By-The-Sea, 123 F.3d at 1160; see Lands Council, 395 F.3d at 1027.
Given this framework, we agree with the district court that the Corps’ cumulative impact analysis satisfied NEPA’s “hard look” requirement. NWEA’s main concern is that the cumulative impact of the channel deepening and Mouth of the Columbia River projects, including the former’s plans for disposal of dredged sediment at the Deep Water Site, will remove a significant amount of sand from the littoral system. This in turn will exacerbate the estuary’s function as a “sand sink” that draws sand away from shorelines, thus accelerating coastal erosion. Within this model, the Corps adequately addressed the two mechanisms that could potentially lead to sediment loss. First, the Corps considered direct sediment loss from disposing of sand in the Deep Water Site, which lies outside of the littoral system. The Corps recognized that unfettered use of the Deep Water Site would have adverse environmental consequences, and structured its plans to minimize disposal there. Second, the Corps examined whether deepening the navigation channel may change river hydraulics, thus altering the rate of sediment flow within the river and to the estuary. The Corps concluded that channel deepening would not have this effect.
Consistent with 40 C.F.R. § 1508.7, the Corps’ analyses considered not just the channel deepening project, but also its relationship with other projects. The FSEIS states:
Although the Congress has authorized the channel improvement project and the MCR project as two separate projects, the Corps and ... [the Environmental Protection Agency] have, where appropriate, coordinated the review of relevant impacts. For example, the 1999 IFR/EIS reviews the long-term disposal plan and its impacts for both the channel improvement and MCR.
i. Potential Direct Sediment Loss from Deepwater Disposal of Dredged Material
a. Potential Direct Sediment Loss from the MCR Project
In challenging the Corps’ actions, NWEA misplaces its focus on the 2004 FSEIS and fails to consider the Corps’ extensive treatment of deepwater disposal in the 1999 Final Integrated Feasibility Report and Environmental Impact Statement. As the 1999 document demonstrates, the Corps was clearly aware of the environmental ramifications of disposing of all of the dredged sediment from the MCR *1135 project in the Deep Water Site.[7] That document states:
If the deepwater site is used as intended (4.5 mcy [million cubic yards] of MCR sand placed per year for 50 yrs), the implications on the littoral sediment budget at MCR and adjacent coastal areas could be profound. The removal of 225 mcy of sand from MCR (via dredging) and subsequent placement at the “deepwater” site would be equivalent to removing the above and below portions of Peacock spit. The result of such a mass removal of littoral sand would likely be adverse: Local and possible regional coastal erosion may result. The stability of MCR jetties may be reduced due to increased toe scour, resulting from such a littoral sediment deficit.
As this statement reveals, the Corps was fully aware of the potential erosion effects entailed by deepwater disposal. Acting upon this knowledge, the Corps evaluated potential sites and structured its plans to minimize such disposal.
In weighing numerous options for ocean disposal of dredged material, the Corps consistently considered the potential for coastal erosion due to sediment loss. In evaluating ten candidate sites for ocean disposal, the Corps gave “great weight” to the assumption that “[njearshore sites have the greatest potential to keep material in the littoral zone.” Based on its analysis, the Corps ultimately recommended Site E, the North Site, and the South Site (these latter two sites ultimately became the Deep Water Site) for EPA designation as Ocean Dredged Material Disposal Sites. The Corps further proposed disposing of material at the North Jetty Site, a non-ocean site which lies within the littoral region.
Recognizing that the “quantity of dredged material that will be placed in proposed Site E and the North Jetty Site is uncertain due to the dynamics of the sites,” the Corps proposed a Deep Water Site that could accommodate excess dredge spoils. The Corps conducted a “conflict matrix” analysis comparing disposal at Site E and the Deep Water Site. Ultimately, it concluded that the benefits of limited dumping at Site E, which would preserve that site’s dispersive nature and prevent wave amplification due to mounding, outweighed the costs of placing some amount of sediment at the Deep Water Site. As we have held before, our role is not to substitute our “judgment for that of the agency concerning the wisdom or prudence of a proposed action. Once satisfied that a proposing agency has taken a ‘hard look’ at a decision’s environmental consequences, the review is at an end.” State of Cal. v. Block, 690 F.2d 753, 761 (9th Cir.1982). Here, it is not our province to assess the wisdom of placing some amount of sediment in the Deep Water Site. Our role is simply to ensure that the Corps considered all relevant factors — including the potential for such disposal to exacerbate erosion' — in arriving at its decision. The Corps clearly did so.
The Corps not only considered sediment loss, it conscientiously structured its disposal plan to minimize it as much as possible. Exhibit H to Appendix H of the 1999 *1136 Final Integrated Feasibility Report and Environmental Impact Statement presents a Management and Monitoring Plan which identifies five objectives, one of which emphasizes keeping sand within the littoral system and counteracting erosion. Consistent with the Corps’ finding that placing dredged material at water depths shallower than 60 feet maximizes its dispersion back into the littoral environment, the Plan requires disposal of dredged material at Site E and the North Jetty Site first, with the Deep Water Site representing a non-preferred last option. While the Final Integrated Feasibility Report and Environmental Impact Statement states elsewhere that the “intended” use of the Deep Water Site is to accommodate all 225 million cubic yards (“mcy”) of dredged material, that term is a misnomer. As the Management and Monitoring Plan reveals, the Corps must first exhaust the dynamic capacity of Site E and the North Jetty Site before placing any sediment in the Deep Water Site, which will ultimately contain far less than 225 mcy of sediment.
Accordingly, in denigrating the Corps’ analyses, NWEA exaggerates the maximum amount of sediment that the Corps will place in the Deep Water Site. The most conservative estimate of the long-term dispersive capacity of Site E and the North Jetty Site is 2 mcy per year, meaning that the Corps will only have to place 2.5 mcy per year in the Deep Water Site.[8] Other estimates of the dispersive capacity of Site E and the North Jetty Site are much higher, and the Final Integrated Feasibility Report and Environmental Impact Statement states that “it is possible that the majority (and perhaps all) of the average annual volume of material could be placed in the North Jetty Site and Site E.” It is illustrative in this regard that between 1973 and 1997, continual use of Site E had not resulted in any persistent mounding. While the Final Integrated Feasibility Report and Environmental Impact Statement as well as the FSEIS propose authorization to dispose of all of the MCR dredged material at the Deep Water Site, the Corps clearly presents this option only for “contingency planning purposes” and as representing a “worst ease” scenario. The Corps has never planned to place all of the material from the MCR project in the Deep Water Site.
Because of how the Corps has structured its disposal plans, it is not reasonably probable that it will use the entire capacity of the Deep Water Site. This calls into question whether NEPA even requires the Corps to analyze the environmental effects of placing all 225 mcy of sediment in the Deep Water Site. See California v. Block, 690 F.2d 753, 761(9th Cir.1982) (holding that an environmental impact statement must contain “a reasonably thorough discussion of the significant aspects of the probable environmental consequences” of a proposed action) (quoting Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir.1974)) (emphasis added). Nevertheless, as discussed above, the Corps did take a hard look at this remote possibility, and recognized the “profound” implications of using the entire authorized capacity of the Deep Water Site. Consequently, the Corps took the additional step of acting upon this knowledge to ensure that it will dispose of an amount nowhere near 225 mcy at that site.
Strict regulations governing ocean disposal ensure that the Corps will not dispose of all 225 mcy of sediment in the *1137 Deep Water Site. The 1999 Final Integrated Feasibility Report and Environmental Impact Statement proposes designating two Ocean Dredged Material Disposal Sites, Site E(later, the Shallow Water Site) and the Deep Water Site. However, the EPA maintains final authority to designate these sites for ocean dumping. See 33 U.S.C. § 1412. As part of this process, sites must have a management and monitoring plan which defines and limits dumping practices allowed there. See 40 C.F.R. § 228.3. As discussed, the Management and Monitoring Plan for the channel deepening project, which is part of the 1999 Final Integrated Feasibility Report and Environmental Impact Statement, clearly establishes that the Corps will dispose of dredged material in the littoral sites first, reserving the Deep Water Site only for excess spoils. Here, the Corps’ “preference” for disposing in the littoral system is much more than that term implies. Because the Management and Monitoring Plan establishes that the Corps will dispose of material in the littoral system first, deviation from that practice may lead to de-designation of the Deep Water Site. Furthermore, the Plan itself outlines several options for potentially altering disposal practices based upon an ongoing review of environmental impact: operational changes, changes in site location, and discontinuing disposal at a particular site. Thus, in addition to establishing a plan to minimize sediment loss, the Final Integrated Feasibility Report and Environmental Impact Statement proposes a plan to monitor, alter, and perhaps even terminate dumping at the Deep Water Site in order to minimize negative environmental impacts.
Further demonstrating the Corps’ hard look, in addition to present and future plans to mitigate sediment loss, the Corps has changed past disposal practices to maintain the maximum amount of sediment within the littoral cell. In 1997, the Corps temporarily expanded Site E because of its “high dispersion rate” and the potential for dredged material placed there to be “re-introduced into the littoral environment of the Washington coast.” This move arose in part from a request by the Washington Department of Ecology in order to retard erosion of coastal beaches.
The record clearly reveals that the Corps considered the potential for coastal erosion due to sediment loss. The Corps even structured disposal plans to minimize this possibility as much as possible. We thus hold that the Corps took a hard look at the effects of removing MCR sediment from the littoral system.
b. Potential Direct Sediment Loss from the Channel Deepening Project
Similarly, the 2003 FSEIS took a hard look at the effects of removing sediment from channel deepening, and concluded that such practice would not diminish sediment availability in the littoral cell. Further undermining NWEA’s concerns, between the 1999 Final Integrated Feasibility Report and Environmental Impact Statement and the 2003 FSEIS, the Corps altered the proposed project, reducing both the volume of proposed dredging as well as the amount of material from channel deepening slated for ocean disposal. As reflected in the 2003 FSEIS, the Corps concluded that, as altered, the channel deepening project simply would not remove enough sediment to make an-environmental difference. Construction and 20 years of maintenance of the proposed 43-foot navigation channel would remove an estimated 70 mcy of sand from the Columbia River and place it in upland disposal sites. Approximately 40 mcy of dredged sand would be disposed of back along the navigation channel or in ecosystem restoration sites in *1138 the estuary. Critically, the analysis reveals that the volume of sand removed by dredging would not reduce the available sand supply in the riverbed. The FSEIS concludes:
[T]he removal of sand from the river will not alter sediment transport to the estuary (Exhibit J). The volume to be dredged over the life of the project is only a tiny fraction of the total volume of sand in the riverbed. In addition, transport potential, rather than sand supply, is the limiting factor in sediment supply to the estuary.
SER 295. Ultimately, by considering the disposal of material dredged from both the MCR and the navigation channel, the Corps took a hard look at the effects of directly removing sediment from the littoral cell through operation of the channel deepening project.
ii. Potential Sediment Loss from Changes in River Hydraulics and Sediment Transport Rates
The Corps also took a hard look at the second mechanism by which channel deepening could potentially reduce sediment availability in the estuary: changes to river hydraulics and sediment transport rates. Exhibit J to the 2003 FSEIS thoroughly analyzes this dynamic and concludes that channel deepening will have no appreciable impact on sediment transport. The Corps prepared Exhibit J in direct response to concerns from Washington and Oregon in 2000 regarding sediment transport. Thus throughout numerous years of study, the Corps did not simply stake out a position and attempt to defend it; consistent with the dictates of a “hard look,”' the Corps remained open to input from stakeholders and conducted new analyses to address their concerns. See Friends of the Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d 989, 995 (9th Cir.1993).
As a threshold matter, Exhibit J scrupulously considers the cumulative impact of the channel deepening project on sediment availability in conjunction with other projects, including the MCR project, jetties, and the Federal Columbia River Power System. The FSEIS reveals that river flow rate mediated by the Federal Columbia River Power System dams — not any past or future dredging in the navigation channel — is the overwhelming driver of changes to sediment availability in the estuary: “The reduction in the Columbia River’s net sand discharge to the MCR since the early 1900’s is related to lower Columbia River flood discharges and not the navigation channel or the MCR jetties.” Regarding the MCR jetties, the FSEIS notes that they have had some impact on sediment availability, by reducing sand movement from the MCR into Baker Bay and across Clatsop Spit into the south channel and by causing a large discharge of sand from the MCR to the ocean. However, Exhibit J repeatedly underscores the reality that “[djeepening will not reduce the available sand supply and the expected hydraulic changes [from channel deepening] are too small to measurably alter sand transport or erosion/ accretion in the river or estuary.” Ultimately, “deepening the navigation channel in the river and estuary will not alter the sand transport through the MCR nor the sediment budget of the littoral cell.” The independent Sustainable Ecosystems Institute expert panel subsequently affirmed the Corps’ extensive sedimentation analy-ses. As a further indication of the comprehensiveness of the Corps’ studies, Washington and Oregon withdrew then-objections and certified the project upon considering the new analyses.
* * *
NWEA cites Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 993 (9th Cir.2004), to support its contention that the Corps’ cumulative *1139 impact analyses are deficient. That case, however, is clearly distinguishable. In Klamath-Siskiyou, the Bureau of Land Management had divided an original timber-sale project into four component timber sales, preparing environmental assessments for two of them. 387 F.3d at 991—92. Upon challenge, we held that the two environmental assessments were “legally insufficient” because they “do not sufficiently identify or discuss the incremental impact that can be expected from each successive timber sale, or how those individual impacts might combine or synergistically interact with each other to affect the ... environment.” 387 F.3d at 997. Klamath-Siskiyou involved one integrated project that was divided into four sub-projects, each of which the BLM independently analyzed, thus obscuring the cumulative impact of successive, related actions. Our situation is quite different. Here, the 1999 Final Integrated Feasibility Report and Environmental Impact Statement and the 2003 FSEIS take a “hard look” at the cumulative impact of the channel deepening and dredged material disposal project over an extended period of time and in conjunction with the Mouth of the Columbia River, Federal Columbia River Power System, and other related projects along the Columbia River. As noted, the 1999 Final Integrated Feasibility Report and Environmental Impact Statement demonstrates the Corps’ awareness of the “profound” implications of disposing of all 225 mcy of material dredged from the MCR at the Deep Water Site. The Corps’ hard look at the problem of coastal erosion is further evidenced by its decision to act upon that knowledge and structure its plan to minimize deepwater disposal.
In conducting and refining these analy-ses, the Corps has not acted alone. While not dispositive, we have found it “significant” when other governmental agencies responsible for environmental protection have sanctioned a particular project’s environmental analyses. See Friends of the Payette, 988 F.2d at 995. Here, the Environmental Protection Agency acted as a Cooperating Agency on both environmental impact statements and validated their findings. As mentioned, the Corps responded to the concerns of Washington and Oregon by providing additional analy-ses, and they have both certified the project.
NEPA requires not that an agency engage in the most exhaustive environmental analysis theoretically possible, but that it take a “hard look” at relevant factors. The Corps has done so, and even took the additional step of altering disposal plans to minimize sediment loss. Through study, restudy, submission to review by independent experts, and modification of plans, the Corps has taken a hard look at the cumulative impact of the channel deepening project, including disposal of dredged material, on sediment availability and coastal erosion.[9]
C. Cumulative Impact Along with Past and Future Actions
We also reject NWEA’s contention that the Corps failed to evaluate the cumu *1140 lative impact of the channel deepening project in light of past and future actions. See Lands Council, 395 F.3d at 1027(“Cumulative effects analysis requires the Final Environmental Impact Statement to analyze the impact of a proposed project in light of that project’s interaction with the effects of past, current, and reasonably foreseeable future projects.”).
i. Cumulative Impact, Along with Past Actions, On Salinity
NWEA argues that the FSEIS does not adequately analyze the cumulative effects of salinity increases from past projects, notably the MCR project. We disagree. Because the FSEIS concludes that the channel deepening project will have virtually no effect on salinity, detailed catalogu-ing of past projects’ impact on salinity would not have “informed analysis about alternatives presented for the current project,” and was unnecessary. Id.
Contrary to NWEA’s assessment, the Corps’ extensive analyses of the channel deepening project’s impact on salinity did indeed include data encompassing past projects. See infra, Part IV.D.ii. The Corps’ analyses included historical data regarding salinity intrusion dating back to the 1980s. The FSEIS references the salinity analysis in the 1983 environmental impact statement for the MCR project, which anticipated that the MCR project would yield minor salinity increases in the estuary. The Corps also stated during the comment period prior to issuing the FSEIS that the “description of existing conditions includes the cumulative impact of historic actions.” The Sustainable Ecosystems Institute panel agreed, stating that “the baseline for evaluating information should be the current conditions or state of the physical and biological components and relationships of the lower Columbia River ecosystems.” Critically, numerous present-day studies cited in the FSEIS reveal that the channel deepening project will have little or no impact on salinity intrusion.
NWEA relies on Lands Council, which states that “the Environmental Impact Statement must give a sufficiently detailed catalogue of past, present, and future projects, and provide adequate analysis about how these projects, and differences between the projects, are thought to have impacted the environment.” 395 F.3d at 1028. Lands Council held as insufficient an environmental impact statement that had “no discussion of the environmental impact from past[timber harvesting] projects on an individual basis, which might have informed analysis about alternatives presented for the current project.” Id. at 1027 (emphasis added). Cataloguing past logging projects’ environmental impact would serve the purpose of promoting “an informed assessment of environmental considerations and policy choices by the public and agency personnel upon review of the Final Environmental Impact Statement.” Id. at 1028. Here, however, numerous studies in the FSEIS demonstrate that the channel deepening project would have virtually no effect on salinity. Therefore, in this case, cataloguing past projects’ effects on salinity would not have informed assessments about the project and its alternatives, and the FSEIS’ analysis of this topic was sufficient.
ii. Cumulative Impact, Along with MCR Jetties and Upstream Dams, on Sediment Transport
We reject NWEA’s argument that the Corps did not adequately consider the channel deepening project’s cumulative effect on sediment transport in light of existing MCR jetties and upstream dams. One of the explicit objectives of Exhibit J was to address “the impact of jetty construction and flow regulation on sediment trans *1141 port.” In cataloguing the effects of MCR jetties, the Corps recognizes that
[t]he MCR jetties reduced the sand transport from the MCR into Baker Bay and across Clatsop Spit into the south channel caused by ocean waves. However, the jetties caused a large discharge from the MCR and vicinity, to the ocean. The sand eroded from the inlet and south flank of the inlet following jetty construction has deposited in the outer delta, on Peacock Spit, and the shorelines along Long Beach, Washington, and Clatsop Plains, Oregon.
Furthermore, the Corps explains that the MCR jetties have “caused a large amount of sediment to accrete in the littoral zone north and south of the entrance” to the Columbia River. Regarding upstream dams, the Corps emphasizes that their control over flood discharges has significantly impacted sediment flow. Flood discharges, caused by dams, directly affect transport capacity and account for the vast bulk of historical changes in sediment budget.
Upon extensively cataloguing these past effects, the FSEIS concludes that the channel deepening project’s incremental contribution to altering sediment flow would be negligible. As Exhibit J states, “[T]he reduction in the Columbia River’s net sand discharge to the MCR since the early 1900’s is related to lower Columbia River flood discharges and not the navigation channel or the MCR jetties.” The Corps thus concludes that, after completion of the channel deepening project, “there is not likely to be a detectable change in the sediment budget or sand transport within the Columbia River.” We thus hold that the Corps properly considered the cumulative impact of the proposed project with MCR jetties and upstream dams.
iii. Cumulative Impact Along with Future Actions
Contrary to NWEA’s assertion, the Corps adequately addressed foreseeable future impacts, particularly from ongoing operation of the MCR project. Regarding such future impacts, this court has held that “[gjeneral statements about ‘possible’ effects and ‘some risk’ do not constitute a ‘hard look’ absent a justification regarding why more definitive information could not be provided.” Neighbors of Cuddy Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1380(9th Cir.1998) (citation omitted). As discussed above, it is precisely because the Corps was aware of the negative implications of disposing of 20 years’ worth of MCR dredgings at the Deep Water Site that it developed a Management and Monitoring Plan to prioritize disposal of dredged sediment at the Shallow Water Site and North Jetty Site. Furthermore, the MCR project has operated consistently since 1983 and “[tjhere is no plan to deepen or otherwise change the ... MCR project at this time.” The Corps took a hard look at the anticipated disposal of 4.5 mcy of dredged sediment per year from the MCR project and planned appropriately to minimize coastal erosion.
D. Direct Impacts
i. Direct Impact on River Toxicity
We further reject NWEA’s argument that the Corps’ analysis of the effects of channel deepening on toxicity is deficient because it failed to test areas outside the navigation channel for toxins. As a preliminary matter, the Corps’ 2001 Biological Assessment contradicts the premise underlying NWEA’s criticism, for it finds that “[n]earshore sediments are expected to be unaffected by dredging activities associated with this project.”[10] Evaluating *1142 nearshore sediments would thus have little bearing on the channel deepening project’s impact on river toxicity, since dredging is not expected to disturb these sediments. The Corps did acknowledge that a limited amount of side-slope adjustment would occur over the course of five to ten years in five discrete locations along the river because these areas have received previously dredged material. Because dredged material is clean sand, however, contaminant sampling in these areas was unnecessary because this sediment would not have contributed to river toxicity.
Nevertheless, as explained in response to NWEA’s comments on the draft FSEIS, the Corps did test for toxins outside of the navigation channel. Specifically, tests conducted pursuant to the Dredge Material Evaluation Framework concluded that “[n]o established level of concern was exceeded in any of the 23 samples tested” for metals, polycyclic aromatic hydrocarbons, and pestieide/polychlorinated biphe-nyls, including two samples from outside the navigation channel. The Biological Assessment notes that risks from shoreline sediments were higher than that of channel sediments, and were higher upstream than in the lower Columbia River. However, it concludes that “[t]he potential for cumulative risks appears negligible because all contaminants posed negligible risks.” The FSEIS ultimately concludes that “while historic actions have resulted in localized sediment contamination in some parts of the larger project area (i.e., outside of the areas to be dredged), the channel improvement project is not expected to make an incremental contribution to sediment quality degradation.” It is significant to note that the independent Sustainable Ecosystems Institute panel validated these analyses by concluding that “contamination was essentially a non-issue, even if suspended on fine sediments, and especially with regard to channel deepening where the sediments are known to be relatively clean.”
ii. Direct Impact on Salinity
NWEA fails in its argument that the Corps did not take a hard look at the channel deepening project’s direct effects on estuary salinity because it did not employ appropriate analytic tools. For the 1999 Final Integrated Feasibility Report and Environmental Impact Statement, the Corps analyzed salinity by utilizing the so-called WES RMA-10 methodology. While NWEA argues that this model is outdated, it offers no evidence that the passage of time has decreased its effectiveness; this model has been “successfully applied” to study estuaries in Cape Fear River, NC; San Francisco Bay; and Galveston, TX. The Corps’ analysis concluded that “[n]o significant biological impact would result from salinity changes predicted for the proposed channel deepening.” A second study prompted by the Sustainable Ecosystems Institute panel updated the first model to accommodate concerns about low flow conditions and again concluded that “the channel deepening actions will have little to no impact on salinity intrusions.” In a third study, commissioned for the 2003 FSEIS, the Oregon Health and Sciences University/Oregon Graduate Institute employed a different modeling technology and again concluded that channel deepening would produce insignificant changes in salinity intrusion. As with the previous WES RMA-10 study, the Sustainable Ecosystems Institute panel reviewed the OHSU/ OGI study and confirmed the results. While NWEA challenges the validity of the new OHSU/OGI model, it provides no cogent challenge to the validity of the WES RMA-10 model, which led to similar findings and has been effectively applied in a multitude of contexts.
*1143 As a final attack on the salinity analysis, NWEA argues that the Corps used outdated bathymetric data in its model, thus falling below NEPA standards. See Lands Council, 395 F.3d at 1031(holding that outdated data may render an analysis inadequate under NEPA). NWEA contends that bank-to-bank bathymetric surveys are necessary to produce the requisite data, and that the Corps last conducted one in 1958. However, NWEA does not demonstrate why bank-to-bank surveys are necessary. Furthermore, the Corps has conducted annual cross-line surveys over the entire length of the project area and surveyed most of the shallow-water areas of the estuary more recently around 1980.
E. Economic Impacts
We also reject NWEA’s challenge to the Corps’ economic analysis. We have recognized that “[ijnaecurate economic information may defeat the purpose of an ... [environmental impact statement] by ‘impairing the agency’s consideration of the adverse environmental effects’ and by ‘skewing the public’s evaluation’ of the proposed agency action.” Natural Res. Def. Council, 421 F.3d at 801 (quoting Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 446-48 (4th Cir.1996)). However, the Corps’ extensive economic analyses in both the 1999 Final Integrated Feasibility Report and Environmental Impact Statement and the 2003 FSEIS satisfy NEPA’s requirements.
NWEA first argues that the Corps violated NEPA because “[t]he Corps’ refusal to consider the cumulative connected, direct impacts of all related dredging and disposal projects and to assess the full impacts of the deepening project ... caused the agency to ignore substantial project costs and ways of avoiding those costs.” These allegations merely represent an attempt to refashion substantive criticisms of the Corps’ considerations of cumulative impacts into arguments about faulty cost analysis. Given that the Corps took a hard look at these substantive issues, these challenges have already been addressed.
We reject the contention that the Corps failed to adequately consider costs associated with jetty deterioration and coastal erosion. Since the Corps’ analyses reasonably concluded that the channel deepening project would not exacerbate jetty deterioration or coastal erosion, excluding these items from the anticipated costs of the project was appropriate.
The Corps adequately considered potential declines in shipping traffic. For example, Exhibit M of the FSEIS assumes that “the Columbia River loses containerized cargo market share to Puget Sound ports.” The 2003 FSEIS presents a much more conservative market capture rate for the Port of Portland than had the 1999 Final Integrated Feasibility Report and Environmental Impact Statement. Furthermore, an independent technical review of the benefits and costs analysis in the draft FSEIS stated that the assumptions and overall conclusions of the benefits analysis were “reasonable” and that “data were generally used properly in the overall analysis.”
NWEA does not provide any clear authority for its argument that the Corps is required to categorize benefits as accruing to domestic or foreign entities. See 33 U.S.C. § 2282(a) (requiring merely that an agency “describe, with reasonable certainty, the economic, environmental, and social benefits and detriments” of a proposed plan). Indeed, agency guidelines cited by both the Corps and NWEA state that calculations of national economic development should include shipments involving foreign origins and destinations. See Economic and Environmental Principles and Guidelines for Water and Related Land Re *1144 sources Implementation Studies, Mar. 10, 1983, at 62, available at http:// www.iwr.usace.army. mil/iwr/pdf/p & g.pdf (last visited Feb. 23, 2006) (“Guidelines”). These guidelines require the Corps to include benefits accruing to foreign flag vessels and do not require segregation of foreign and domestic benefits in analyses of national economic development.
We reject NWEA’s argument that the Corps should have engaged in a multiport analysis to assess whether any gains from the channel deepening project would come at the expense of other domestic ports. An Economic Technical Review panel, convened by the Corps, examined the Corps’ economic analysis and concluded that “the results of a ‘multi-port analysis' would be unlikely to tip the cost-benefit scales.” (emphasis in original). In any event, the Corps’ statement that a multiport analysis would likely result in higher projected benefits appears reasonable. When defining the “economic study area” for a proposed navigation improvement project, an agency should, when appropriate, include nearby, existing harbors which may experience a decrease in traffic after the proposed improvement. Guidelines 62. However, in calculating the economic benefits of the proposed project, the agency should consider the aggregate reduction in shipping costs across the entire economic study area. Thus, the fact that an efficiency-enhancing improvement may> draw traffic away from less efficient harbors actually contributes to, rather than subtracts from, the anticipated benefits of that improvement. Accordingly, “Cost reduction benefits sufficient to divert traffic from established distribution patterns and trade routes are navigation project benefits.” Guidelines 62 (emphasis added). Ultimately, NWEA has not demonstrated that the absence of a multi-port analysis renders the Corps’ analysis arbitrary and capricious.
The Corps hired two independent panels of experts to review, respectively, the costs and benefits contained in its economic analyses. Both panels concluded that the Corps’ analyses were reasonable. Based on our independent examination of the record, we likewise find that the Corps’ economic analyses satisfied NEPA’s requirements.
F. Exclusion of the Niemi Declaration
Finally, we hold that the district court did not abuse its discretion by striking the declaration of economist Ernest Niemi. Niemi stated in his declaration that he prepared it at NWEA’s request to “determine whether or not the FSEIS provides a misleading description of the Project’s potential economic impacts.” Quoting Asarco, Inc. v. EPA, 616 F.2d 1153, 1160 (9th Cir.1980), the district court struck the declaration because “consideration of extra-record evidence ‘to determine the correctness ... [or] wisdom of the agency’s decision is not permitted.’ ” The district court acted well within its discretion to do so.
We have held that review of agency action under NEPA is limited to the administrative record and may only be expanded beyond the record to explain agency decisions. Friends of the Payette, 988 F.2d at 997; see Love v. Thomas, 858 F.2d 1347, 1356 (9th Cir.1988). Accordingly, administrative review disfavors consideration of extra-record evidence. Florida Power & Light Co. v. Lorion, 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (“ ‘[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.’ ”) (iquoting Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)). Here, the administrative record is ade *1145 quate to explain the Corps’ decisions and reveals that the agency has taken a hard look at all pertinent factors.
We have previously carved out a discrete set of narrow exceptions to the general rule against extra-record evidence, none of which are applicable in this case. As we held in Lands Council:
In limited circumstances, district courts are permitted to admit extra-record evidence: (1) if admission is necessary to determine “whether the agency has considered all relevant factors and has explained its decision,” (2) if “the agency has relied on documents not in the record,” (3) “when supplementing the record is necessary to explain technical terms or complex subject matter,” or (4) “when plaintiffs make a showing of agency bad faith.”
Lands Council, 395 F.3d at 1030(quoting Sw. Ctr. for Biological Diversity, 100 F.3d at 1450). Here, as mentioned, the record reveals that the Corps considered all relevant factors and provides an adequate basis for explaining the Corps’ decisions. NWEA has not demonstrated that the Niemi declaration was the sole source of any vital information without which judicial review was “straitjacketed.” See Asarco, 616 F.2d at 1160. Furthermore, NWEA does not allege that the Corps relied on documents outside the record or that it acted in bad faith. Finally, the Niemi declaration and its attachments address fairly straightforward economic aspects of the Corps’ analysis, not technical and scientific analyses that might require further explanation. Given the failure of NWEA to establish any exception to the general rule against allowing extra-record evidence, it was not an abuse of discretion for the district court to strike Niemi’s declaration. See Sw. Ctr. for Biological Diversity, 100 F.3d at 1447.
V. Conclusion
It is not the office of this court to pass upon the wisdom of an agency action or to require an agency to study a proposed action ad infinitum. Our role is simply to assure that the agency has taken a hard look at the proposed action. In this case, the Corps has demonstrated the hard look by performing exhaustive studies over numerous years, soliciting and accommodating input from stakeholders, and thoroughly re-analyzing areas of particular concern. The Corps considered deepwater disposal of sediment and modified its plans in order to minimize sediment loss. It studied potential changes to river hydraulics and concluded that there would be none. It analyzed salinity effects on three separate occasions using current data. It examined toxicity, both within and without the navigation channel. It assessed economic impacts using realistic measurements of the project’s costs and benefits. The Corps did not simply consider the channel deepening project in isolation, but analyzed its cumulative impact in conjunction with the MCR and other projects. The Corps responded to concerns from Oregon and Washington about sediment availability and provided additional analyses that led the states to certify the project. The Corps subjected its analyses to review by independent scientists who subsequently verified the Corps’ findings. In light of all of the above, we agree with the district court that the Corps took the required hard look. The judgment of the district court is AFFIRMED.

. NWEA also challenges a 1998 Dredged Material and Management Plan and Supplemental Environmental Impact Statement completed for an alternative project to maintain the current channel depth. Because we hold that the 2003 Final Supplemental Integrated Feasibility Report and Environmental Impact Statement for the channel deepening project satisfied the National Environmental Policy Act, we do not reach the issue of the 1998 Dredged Material and Management Plan and Supplemental Environmental Impact Statement.

. The 2003 Final Supplemental Integrated Feasibility Report and Environmental Impact Statement includes a plan to use dredged material from channel deepening in restorative actions in the estuary. However, if the restoration features are not fully implemented, then the Corps will dispose of material in the ocean as described in the 1999 Final Integrated Feasibility Report and Environmental Impact Statement.

. The Shallow Water Site occupies an extended area that includes the former expanded Site E. The 1999 Final Integrated Feasibility Report and Environmental Impact Statement refers to the older area, Site E. However, the Environmental Protection Agency had initiated preliminary rulemaking processes to replace Site E with the Shallow Water Site at the time the Corps issued the 2003 Final Supplemental Integrated Feasibility Report and Environmental Impact Statement, and that document thus refers to the Shallow Water Site. Because these sites are materially different, this opinion will refer to either "Site E” or to the “Shallow Water Site” as appropriate.

. Some amount of sediment placed at dispersive sites naturally migrates out of the site and settles elsewhere, thus increasing these sites' dynamic capacity.

. While the Corps is the Lead Agency responsible for issuing the Final Integrated Feasibility Report and Environmental Impact Statement, the United States Environmental Protection Agency is listed as a Cooperating Agency.

. Because the parties refer to this document as “FSEIS,” we do as well. As with the 1999 Final Environmental Impact Statement, the 2003 FSEIS lists the Corps as the Lead Agency and the Environmental Protection Agency as a Cooperating Agency.

. Because the MCR project involves a significantly greater volume of dredged material potentially available for ocean disposal than channel deepening and maintenance (225 million cubic yards versus 37 million cubic yards), Appendix H focuses on the ramifications of deepwater disposal of material from the MCR project. The Corps later modified the channel deepening project to reduce overall dredging as well as the amount of channel deepening sediment to be placed in ocean sites. The 2003 FSEIS, and in particular Exhibit J, extensively examines the impact of removing material from channel deepening and maintenance from the littoral cell, and concludes that it is negligible.

. This figure appears in the 1999 Final Integrated Feasibility Report and Environmental Impact Statement and includes the dispersive capacity of Site E. Presumably, the dispersive capacity of the Shallow Water Site is even greater than that of Site E because of the Shallow Water Site’s larger area.

. NWEA also argues that the Corps should have considered the channel deepening and MCR projects as "connected actions,” and thus jointly evaluated both in the FSEIS. See 40 C.F.R. § 1508.25(a)(l)(stating that connected actions fall within the required scope of an environmental impact statement). In its summary judgment order, the district court ruled that the channel deepening and MCR projects are not connected actions, and that joint evaluation of the two was only required to the extent that they had a cumulative impact on the environment. NWEA does not appeal the district court's ruling that the two projects are not connected actions, and instead focuses its arguments on the FSEIS' cumulative impact analysis.

. The 2001 Biological Assessment appears in Exhibit H of the 2003 FSEIS.